# In the United States Court of Federal Claims

## No. 14-1005C
### (Bid Protest)
### (Filed: February 13, 2015) [1]

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                              *
DRAKEN INTERNATIONAL, INC.,                   *
                                              *
           Plaintiff,                         *
                                              *
      v.                                      *
                                              *
THE UNITED STATES,                            *
                                              *
           Defendant,                         *
                                              *
      and                                     *
                                              *
AIRBORNE TACTICAL ADVANTAGE                   *
CO., LLC,                                     *
                                              *
           Intervenor.                        *
                                              *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Pre-award Bid Protest; 28 U.S.C. § 1491(b)(1); Competition in Contracting Act; 41 U.S.C. § 3306(a); Solicitation Terms Coupled With Procurement Delay Did Not Unduly Restrict Competition; Ripeness.

Alan Pemberton, Saurabh Anand, and Christine Minarich, Covington and Burling, LLP 1201 Pennsylvania Ave, NW, Washington, D.C. 20004, for Plaintiff.

Joyce R. Branda, Robert E. Kirshman, Jr., Bryant G. Snee, and Joseph E. Ashman, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

Robert K. Tompkins, Holland & Knight, 800 17th Street, NW, Suite 1100, Washington, D.C. 20006, for Intervenor. Elizabeth M. Gill and Elizabeth N. Jochum, Holland & Knight, 800 17th Street, NW, Suite 1100, Washington, D.C. 20006, Of Counsel. Richard B. Benenson, Brownstein Hyatt Farber Schreck, LLP, 410 Seventeenth Street, Suite 2200, Denver, CO 80202, Of Counsel.

---

[1] The Court issued this opinion under seal on January 31, 2015, and directed the parties to file proposed redactions by February 13, 2015. The Court publishes this Opinion indicating redactions by asterisks "[***]."

---
**OPINION AND ORDER**
---

**WILLIAMS**, Judge.

     This pre-award bid protest comes before the Court on the parties' cross-motions for judgment on the Administrative Record ("AR").  Plaintiff, Draken International, Inc. ("Draken"), challenges the procurement process implemented by the Department of the Navy's Naval Air Systems Command ("NAVAIR") under solicitation number N00019-12-R-1001.  Plaintiff argues that NAVAIR violated the Competition in Contracting Act ("CICA") and the Federal Acquisition Regulation ("FAR")[2] because its delay in conducting the procurement coupled with the solicitation's requirement that the awardee provide both subsonic ("Type III") and supersonic ("Type IV") aircraft unduly restricts competition.  Plaintiff asserts that this solicitation process will result in a de facto sole-source award to Airborne Tactical Advantage Co., LLC ("ATAC"), the incumbent. Because ATAC is currently being paid by the Government to maintain its fleet, Plaintiff submits that ATAC can avoid the prohibitive cost foisted upon other offerors of meeting operational readiness requirements during a prolonged procurement process.  Plaintiff also protests the duration of a sole-source bridge contract awarded to ATAC, which could potentially last until July 2015, given the option periods.  Finally, Plaintiff contends that it was treated unequally compared to [***] other offerors that were allowed to provide new airworthiness data after the deadline for submission of initial offers, while it was not given this opportunity.

     Plaintiff seeks a declaratory judgment that NAVAIR violated CICA and the FAR by unduly restricting competition in its conduct of this procurement.  Plaintiff also asks the Court to order NAVAIR to limit the term of ATAC's sole-source bridge contract to coincide with a final award date and to amend the solicitation to separately procure subsonic and supersonic aircraft services. Alternatively, Plaintiff asks the Court to limit an award under the current solicitation to the base year and issue a new solicitation for subsequent years or allow all offerors the opportunity to offer new aircraft in the event their originally proposed aircraft are no longer available.

     Defendant argues that Draken's challenge to the solicitation's terms combining procurement of supersonic and subsonic aircraft is untimely, that the delay in the procurement process resulted from multiple protests, and that the solicitation's terms are reasonable and necessary to meet NAVAIR's requirements.  Defendant asserts that Draken was not treated any

---

[2]    Plaintiff argues that Defendant violated "FAR Part 6" and FAR 15.305.  See Pl. Mot. for Judgment on the AR at i, 24.  Plaintiff does not specify a specific provision within FAR Part 6, but FAR Part 6 generally "prescribes policies and procedures to promote full and open competition in the acquisition process." 48 C.F.R. § 6.000 (2012).  Plaintiff does not further explain how it believes the Government violated FAR 15.305, which discusses factors for proposal evaluation and requires that "an agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. § 15.305.

differently than other offerors, as Draken was also given a chance to amend its proposal.  ATAC argues that Draken does not have standing to bring the instant protest because it no longer qualifies for award, that no improper bundling of requirements has occurred, and that Draken's allegations of unfair treatment are not ripe.

For the reasons that follow, the Court finds that Plaintiff has standing, its protest is timely, the Agency's delayed procurement process did not violate CICA, and Draken's challenge to unequal treatment is unripe.

### Findings of Fact[3]

### The Contracted Air Services Program and Issuance of Solicitation N00019-12-R-1001

The United States Department of the Navy's Contracted Air Services ("CAS") program "provides Contractor owned and operated aircraft, personnel, equipment and support for Fleet training and exercises to a variety of customers to include: United States Navy (USN), Foreign Military Sales, and other Department of Defense (DoD) agencies and DoD contractors."  AR 223. Contractors working under the CAS program provide aircraft and related services for "airborne threat simulation" and training exercises for the benefit of "shipboard and aircraft squadron weapon systems operators and aircrew . . . ." Id.  In May 2009, ATAC was awarded a firm fixed price/indefinite-delivery indefinite-quantity contract for the provision of both subsonic Type III and supersonic Type IV aircraft, which fly at higher speeds and are more expensive and difficult to obtain, to support the CAS program.  Id. at 35-36, 225, 3407.  This contract ended on July 28, 2014, and NAVAIR has been obtaining these services via ATAC's sole-source bridge contract since then.  Id. At 3407.

On June 21, 2013, Sean Stackley, the Assistant Secretary of the Navy (Research, Development and Acquisition) wrote a "Determination and Findings For Authority to Award a Single Source Task Order Contract" for the solicitation at issue.  Id. at 4469. This document was created because the Department of Defense may not award task and delivery order contracts exceeding $103 million, inclusive of options, to a single source, "unless the head of the agency determines in writing that the task or delivery orders expected under the contract are so integrally related that only a single source can reasonably perform the work." Id.  According to Assistant Secretary Stackley, a single-source indefinite-delivery/indefinite-quantity contract permitted "the greatest flexibility in both quantities and schedule to meet the needs of the Fleet in providing combat readiness training." Id.  Furthermore, making a single contractor "the integrator across all locations" avoided the Government either having to take on this integrator role itself or expend additional resources that were not budgeted. Id. at 4470.

Assistant Secretary Stackley articulated reasons why Type III and Type IV aircraft were included in the same solicitation, stating:

---

[3]     These findings of fact are derived from the AR.  Additional findings of fact are in the Discussion.

3

The simultaneous presentation requirement for high subsonic and supersonic aircraft was developed based on the current contract practice of authorizing the contractor to fulfill high subsonic missions with supersonic aircraft, which are billed at the lower high subsonic contract rate. This augmentation of high subsonic aircraft allows the Government to minimize the required quantity of high subsonic aircraft without compromising the ability to cover surge requirements.

With a multiple award contract, the ability to augment high subsonic aircraft for surge requirements is lost, and the Government would be required to increase the required number of high subsonic aircraft to maintain the same level of contractor coverage. The ability to augment high subsonic aircraft saves the [United States Navy] and [the Department of Defense] money because it results in a higher utilization of supersonic aircraft and avoids the payment of fixed aircraft costs for additional high subsonic aircraft. Due to fiscal constraints, which are expected to become more severe, the [United States Navy] and [the Department of Defense] do not have the funds to cover the cost of additional high subsonic aircraft; therefore, award of a multiple award contract would result in a degraded level of training because fewer aircraft would be available for scheduling.

Additionally, this scenario would lead to inefficiencies and increase contractor costs to the point of making the desired level of training unaffordable. A single source provider gains efficiencies due to commonality of resources provided for each aircraft platform at each site. Aircraft platforms at each site require mechanics, parts, and tooling, as well as Quality Assurance, training, certification and technical publication support functions. These can all be achieved across both the high subsonic and supersonic aircraft using shared manpower, common spaces, and a large amount of common parts and tooling.

Two contractors performing at a single location, each providing the training services on separate types of aircraft, would require additional space, parts, tooling and personnel resources to maintain the same level of service as a single source provider. This would directly increase the contract costs of the training. The [United States Navy] and [the Department of Defense] do not have the funds to cover increased training costs; therefore less training flight time would be ordered – resulting in a degraded state of operational readiness.

For the reasons stated above, the task orders expected to be issued under this contract are so integrally related that only a single source can reasonably perform this effort, and awarding task orders to different contractors based upon the type of aircraft would not be feasible.

Id. at 4470-71. Assistant Secretary Stackely concluded, "[i]f a single source task order contract award is not approved, the Government would lose the advantage of efficiencies and economies of a single contractor operating all aircraft across all geographic areas, would risk aircraft availability for surge requirements, and would incur duplication of costs associated with providing and maintaining multiple fleets of aircraft." Id. at 4473.

On July 25, 2013, NAVAIR issued the solicitation.  The performance period was to be up to five years, comprised of a base year and four one-year options. Id. at 258, 514. This solicitation sought at least 14 Type III aircraft and five Type IV aircraft and related services.  Id. at 721, 723. The original due date for offers was September 24, 2013, and the contract was to commence upon award with a 60-day "phase-in period," during which the contractor was required to become operationally ready.  Id. at 495, 514.   Operational readiness included securing an East Coast permanent basing site and "positioning required aircraft and support infrastructure to other permanent basing sites." Id. at 998.

Section L, Volume 2.1, set forth the technical pre-requisites, requiring a copy of the FAA Airworthiness Certificate for each aircraft, identifying the aircraft by tail number, and identifying each aircraft as "primary" or "backup."  Id. at 569. Volume 2.3 required offerors to provide detailed aircraft airworthiness data.  This data was to include tracking and planning for replacement of parts, an inspection plan, modifications to each aircraft after it was retired from military use, "an accounting for the timeframe from manufacture to proposal submittal date" and a description of each aircraft's maintenance history. Id. at 572-73.

The "anticipated award date" was stated to be March 1, 2014, and the solicitation indicated that "[t]his information is provided for use as a basis for schedules and burden (labor, overheads, G&A, etc.) mid-point calculations."  Id. at 586.   Additionally, the performance periods were described as "estimates only." Id. at 515.  The award would be made on a "best value" basis in consideration of the technical, past performance, and cost factors, in that order of importance. Id. at 589.

## Amendments to the Solicitation and Air USA, Inc.'s Protests

The solicitation was amended 10 times. The amendment relevant to the instant case is Amendment 6, issued on October 11, 2013, which created two phases to the technical evaluation. Id. at 848, 866-67. In Phase I, the Government would create a single technical rating for each proposal based on the required technical elements, including the provision of airworthiness data. In Phase II, offerors were required to provide FAA Airworthiness Certificates for each aircraft "no later than three (3) business days following the Government's request for Final Proposal Revisions (FPRs), "anticipated to be on or about 3 July 2014."  Id. at 1059. Amendment 5 changed the due date for proposals to November 12, 2013 and the anticipated award date was extended to April 1, 2014, in Amendment 6.  Id. at 847, 882.  Amendment 6 also removed the requirement that offerors provide FAA Airworthiness Certificates at the time of proposal submission.

Amendment 6 was spurred by the September 24, 2013 agency protest of Air USA, Inc. ("Air USA").  Id. at 2737, 2759.  In its protest, Air USA argued that requiring offerors to submit an FAA Airworthiness Certificate and tail numbers as a prerequisite to award restricted competition because only the incumbent would be able to provide this information at the time of proposal submission.  Id. at 2744-45.  Specifically, Air USA contended:

> [T]he Agency is not only demanding that the aircraft have FAA Airworthiness Certificates and all tail numbers be assigned at least six (6) months before

> contract award and an additional sixty (60) days before mission readiness, the Agency is asking the bidders to make an investment of approximately tens of millions of dollars in aircraft to sit on the tarmac and provide all maintenance and indirect costs to protect their investment with no return on investment.  In that regard and upon information and belief, the incumbent is the only bidder that can meet that requirement.

Id. at 2746.

After Amendment 6 was issued, on October 23, 2013, Air USA filed a supplement to its first agency protest.  In this supplement, Air USA argued that an FAA Airworthiness Certificate could not be obtained without the aircraft and maintenance records, so changing the date of submission of the FAA Airworthiness Certificates but still requiring airworthiness data at the time of proposal submission negated Amendment 6.  Id. at 2761.  Air USA referenced a Question and Answer, regarding the timing of submitting airworthiness data and asked if the requirements of Technical Element #2, the airworthiness data, could be submitted at the same time as the FAA Airworthiness Certificates.  Id.  The Agency responded no, stating:

> Airworthiness Data is a critical component of the CAS Fighter Jet Source Selection. This technical evaluation factor represents fundamental aspects of airworthiness and will be used to determine an [offeror's] airworthiness risk assessment while flying under Public Use Status. As a result, this information must be received during the evaluation phase of the source selection in order to evaluate, assess and make a determination, which is different than receiving the FAA certification which only requires validation. Therefore no conflict exists in the solicitation and no revision will be made.

Id. at 2762.  On November 5, 2013, the Agency rejected Air USA's protest, reaffirming that airworthiness data was "necessary for proposal evaluation" and "needed at time of proposal submission."  Id. at 2765.

On November 7, 2013, Air USA filed a Government Accountability Office ("GAO") protest raising the same ground as its agency protest. Id. at 2767. Air USA requested that the award date be stayed in its GAO protest.  Id. at 2769.   On February 14, 2014, the GAO denied Air USA's protest, finding that the Agency had "reasonably established a legitimate need for airworthiness data documentation at the time of proposal submission," and that "[g]iven the critical need to ensure the safety of government and civilian personnel . . . the agency's interest in evaluating each aircraft's airworthiness data through a thorough assessment of the documentation provided at the time of proposal submission is reasonable to achieve the highest level of reliability and effectiveness."  Id. at 3243.

## Proposal Evaluation Results, Evaluation Notices, and Discussions

[***] companies submitted proposals in response to the solicitation – [***], ATAC, Draken, and [***] -- and were evaluated under the factors of technical, past performance, and total evaluated price.  Id. at 3256.  On June 18, 2014, [***] were given an [***] rating for the

technical factor, with [***] and [***] being found a [***] in this category and Draken and ATAC being found a [***].  Id.  In the past performance category, [***] had a [***] rating, both ATAC and [***] were [***] and Draken was given a [***] rating.  Id.  Draken's price was the [***] of the [***] bidders.  Id.  All were found to be [***] with the RFP and all were deemed [***] of receiving the award.  Id.  In determining [***] rating and risk for the technical factor, the evaluators noted as one [***] that [***] had not provided any [***].  Id. at 3263.  Draken's [***] included [***].  Id. at 3277.  Draken received scores of [***] [***] [***] [***].  Id. at 3280.  The April 1, 2014 award date passed without an award being made, and award is now anticipated in February 2015.[4]  The Procuring Contracting Officer testified that the anticipated award date has been pushed back several times due to ongoing discussions with the offerors, the need for additional time to evaluate proposal revisions, and Draken's instant bid protests.

On June 20, 2014, the Agency determined that all offerors were within the competitive range and that discussions pursuant to FAR 15.306(d) were necessary due to [***]. . . ."  Id. at 3371.  At the beginning of July 2014, NAVAIR sent out 107 evaluation notices ("ENs") to the offerors so that they could provide further information "to assist the Government in its final evaluation of the proposals."  Id. at 3416.[5]  These ENs addressed various deficiencies in each offeror's proposal.  One EN allowed [***] to provide the missing airworthiness data required by Technical Element # 2, but the record does not indicate whether [***] provided this data.  Id. at 3439.  Offerors were originally instructed to respond to the ENs by July 24, 2014, but this date was extended to August 4, 2014, at the request of offerors.  Id. at 4467.

On July 24, 2014, [***] sent a letter to NAVAIR regarding EN responses, indicating that it was redirecting [***].  Id. at 3801-02.  The record does not indicate what the Government's response to [***] letter was.

## ATAC Bridge Contract

While the EN process was ongoing, on July 11, 2014, the Navy issued a Justification and Approval For Use of Other Than Full and Open Competition ("Justification") to award ATAC a sole-source bridge contract commencing on July 29, 2014, with a three-month base period and three additional three-month option periods, permitting the sole-source contract to last until July 2015.  Id. at 3373, 3407. The Justification stated that the sole-source contract was necessary to prevent a gap in training services between the end of ATAC's incumbent contract on July 28, 2014, and the "follow on competitive contract."  Id. at 3407.  Furthermore, according to the

---

[4]    On November 28, 2014, the Government filed a motion to amend the Administrative Record to add a November 26, 2014 Declaration of Phillip Smith, the Procuring Contracting Officer.  Plaintiff did not oppose this motion. As this testimony directly relates to the alleged excessive timeframe of the procurement at issue, this motion is granted. See Axiom Res. Mgmt. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

[5]    Although the AR only contains ENs sent to [***] and [***], and the proposals of these two companies in response to the ENs, the record reflects that [***] offerors received ENs and were given an opportunity to respond.  The Agency created a "CAS Fighter Jets EN Matrix" that catalogues each EN, each offeror's response, and the status of resolution.  Id. at 3410. Draken's EN responses are also referenced in the Agency's denial of its protest.  Id. at 4467.

Justification, ATAC had personnel on site and could continue performance and avoid a "gap in contractual support" that "would ultimately lead to an unacceptable decrease in mission readiness by precluding the pilots and ships the opportunity to train in simulated scenarios." Id. at 3408.

**Draken's Agency Protest**

On July 24, 2014, Draken filed a protest with NAVAIR arguing that the short operational readiness requirement forced all offerors except the incumbent to possess and maintain aircraft at their own expense while the Agency made its selection decision, and the requirement that offerors provide both Type III and Type IV aircraft "became improperly restrictive when combined with the extraordinary procurement delays that the Agency has imposed on this process." Id. at 4438. Draken acknowledged that while these requirements "posed some barriers to competition" when the solicitation was issued, "these limitations arguably were reasonably necessary to meet the Agency's needs and provided the agency a reasonable period of time to review offerors' proposals." Id. at 4439. However, according to Draken, "as the delays and uncertainty in the selection process have mounted, these limitations have made the selection process defective and anticompetitive, and have proven to be unnecessary in light of the Agency's needs." Id. In this protest, Draken noted [***]. During an August 5, 2014 teleconference with the Agency regarding its agency protest, Draken confirmed that it would no longer be able to meet the Type IV requirement. Id. at 4467.

On September 5, 2014, NAVAIR denied Draken's protest. The Agency found that any protest of the inclusion of both Type III and Type IV aircraft was required to be submitted prior to the closing date for initial receipt of proposals. Id. at 4486. The Agency rejected Draken's argument that the length of the evaluation process could make a requirement that was not restrictive at the time of proposal submission unduly restrictive at a later time.

**Discussion**

**Standing**

As a preliminary matter, ATAC challenges Draken's standing.[6] Draken "'bears the burden of establishing [the] elements [of standing]'" because it invokes this Court's jurisdiction. Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (alterations in original) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). To have standing in a bid protest, a protestor must be an "interested party." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)). To be an "interested party," a protestor must show: (1) that it is an "actual or prospective bidder" (2) "whose direct economic interest would be affected by the award of the contract." Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing Rex, 448 F.3d at 1307). As the term denotes, an actual bidder is one who submitted a bid for the challenged procurement. Rex, 448 F.3d at 1307.

---

[6] While the Government argues that Draken's protest of the solicitation terms is untimely, it does not challenge Draken's standing to protest.

"Generally, to prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract."  Orion, 704 F.3d at 1348 (citing Rex, 448 F.3d at 1308). There is, however, "[a]n exception to that standard [] when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid."  Id. (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1361 (Fed. Cir. 2009)).  In the pre-bid context, the protestor can establish a direct economic interest "by demonstrating that it suffered a 'non-trivial competitive injury which can be redressed by judicial relief.'"  Id. (quoting Weeks Marine, 575 F.3d at 1361-62).   However, where bids have been submitted but an award has not been made, the correct test of economic interest is the "substantial chance" test used in the post-award context, not the "non-trivial competitive injury" test.  Id.

ATAC contends that Draken lacks standing because it has unresolved ENs and can no longer meet the Type IV aircraft requirement and thus "currently does not have a substantial chance of receiving the contract, but for the alleged error."  Intervenor Mot. for Judgment on the AR 20.  To satisfy the substantial chance test, a protester "must demonstrate more than a 'mere possibility that [it] would have received the contract but for the [alleged] error [in the procurement process].'"  CliniComp Int'l v. United States, 117 Fed. Cl. 722, 734 (2014) (alternations in original) (internal citations omitted) (quoting Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 18 (2005).  However, "'a protester is not required to show that but for the alleged error, [it] would have been awarded the contract.'"  Id. (alteration in original) (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).

As ATAC acknowledges, "[t]he question whether a protester 'ha[s] a substantial chance of securing the award,' turns on whether the protester would have had a substantial chance if not for the alleged errors."  Comint Sys. Corp. v. United States, 700 F.3d 1377, 1383 (Fed. Cir. 2012) (emphasis added) (quoting Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002)).  The error alleged by Draken in this protest is that the Agency's delay in conducting the procurement, coupled with its operational readiness requirements for both Type III and Type IV aircraft, makes the solicitation anti-competitive.  If these alleged errors had not occurred, i.e. the Agency had met its original anticipated award date and not delayed the procurement process, Draken could have – as it did – submitted its offer and met the solicitation terms, expensive though they were.  Only after the Agency extended the anticipated award date by almost a year did the requirements for Type IV aircraft become financially prohibitive.[7]  As Draken submitted the [***] bid and [***] ATAC in the technical risk category, Draken had a "substantial chance" of being awarded the contract, but for the alleged defect in the procurement process – unduly restrictive solicitation terms and prolonged delay.  The fact that Draken has allegedly unresolved ENs does not alter this conclusion as the EN process has not been concluded.

---

[7]     The requirement to supply both Type III and Type IV aircraft became impossible for Draken to meet once, after delay, it lost its surprise subcontractor.  Dec. 8, 2014 Oral Arg. Tr. at 23:3-7 (describing how Draken was able to originally submit a proposal due to finding a "surprise" subcontractor, who has been "unable to stick with it throughout these extensive delays").

**Standard of Review for Bid Protests**

The Court evaluates bid protests pursuant to the Administrative Procedure Act's standard of review for an agency action. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). This Court will not disturb an agency's procurement decision unless the Court finds that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014). Under Rule 52.1, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record. See Bannum, 404 F.3d at 1356.[8] Looking to the AR, the Court must determine whether a party has met its burden of proof based on the evidence in the record. Id.

**Plaintiff Failed to Establish that the Agency's Delay Caused the Solicitation Requirements to Become Unduly Restrictive in Violation of CICA**

Plaintiff contends that the Agency violated CICA citing "two primary defects" in the solicitation -- the combination of Type III and Type IV services and the 60-day operational readiness requirement -- which, "in combination with Agency delays, unduly restrict competition." Pl. Mot. for Judgment on the AR 25. Draken acknowledges that "[w]hile the [s]olicitation requirements initially appeared difficult but reasonable" based on the Agency's "promised" award timeline, "they are no longer reasonable now that the Agency has decided to extend the timeframe for making an award by up to *five times* its original estimate." Id. at 15 (emphasis in original). Thus, in Plaintiff's view, while the solicitation did not contain anti-competitive terms at the time of proposal submission, the subsequent delay in the procurement process rendered these terms anti-competitive.

**Plaintiff's Challenge to the Solicitation Terms is Untimely**

To the extent that Plaintiff argues that the solicitation's requirements for operational readiness and both Type III and Type IV aircraft unduly restrict competition, such an argument is untimely. As the Federal Circuit held in Blue & Gold Fleet, L.P. v. United States, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d 1308, 1313 (Fed. Cir. 2007). "[W]here there is a 'deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'" Id. at 1314 (alteration in original) (citing N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002); see also Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005); MVM, Inc. v. United States, 46 Fed. Cl. 126, 130 (2000);

---

[8]     ATAC relies upon documents that are not part of the AR. Pursuant to Rule 52.1, the Court has not considered these documents. See Intervenor Br. 6 n. 1-2, 7 n. 3, 8 n. 4-5, 9 n. 6-8, 10 n. 9, 31 n. 18-19.

Allied Tech. Group, Inc. v. United States, 39 Fed. Cl. 125, 146 (1997); Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 358 (1994)).

**Plaintiff's Claim of Undue Procurement Delay is Timely and Reviewable**

While Blue & Gold prevents Plaintiff from challenging solicitation terms, it does not prevent Draken from protesting alleged pre-award deficiencies in the procurement process. The delay that Draken argues has made the procurement process anti-competitive was not a term of the solicitation.  There was no basis on the face of the solicitation for Plaintiff to challenge what later became, in its view, an unduly lengthy procurement process. The solicitation stated that the "anticipated" award date was March 1, 2014, information that was to be used by bidders as "a basis for schedules and burden (labor, overheads, G&A, etc.) mid-point calculations."  AR 586.  Plaintiff does not contend that this solicitation term was defective, only that the Agency's subsequent departure from that anticipated date rendered the procurement anti-competitive.  As Draken is not challenging a solicitation term, but instead the combination of delay in the procurement process with requirements that allegedly became unduly restrictive due to this delay, Draken's protest is timely under Blue & Gold.

**Plaintiff Has Not Established a Violation of CICA**

The plaintiff in a bid protest bears the burden of proving that a "clear and prejudicial" error marred the procurement in question.  CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988) (quoting Kinetic Structures Corp. v. United States, 6 Cl.Ct. 387, 394 (1984); DeMat Air, Inc. v. United States, 2 Cl.Ct. 197, 202 (1983)).  Plaintiff contends that the Agency's delay in the procurement process coupled with the solicitation requirements for Type III and Type IV aircraft and operational readiness caused offerors "to bear expenses five times longer than forecast" and violated CICA.  Pl. Mot. for Judgment on the AR 25.

Plaintiff presents no authority to support the proposition that it is a violation of CICA for an agency to delay an award, causing "difficult but reasonable" solicitation requirements to become unduly restrictive of competition due to the passage of time.  CICA requires procuring agencies to "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division [41 U.S.C. §§ 3301 et seq.] and the Federal Acquisition Regulation" and to "use the competitive procedure or combination of competitive procedures," such as sealed bids "that is best suited under the circumstances of the procurement." 41 U.S.C. § 3301 (2012).

Plaintiff has not demonstrated that the procedures NAVAIR used in the instant negotiated procurement – which still has [***] offerors – were anti-competitive or violated any statutory or FAR provision.  Plaintiff does not allege a failure of the Agency to use an identified competitive procedure required by CICA and the FAR.  Rather, Plaintiff persists in attempting to raise an untimely challenge to the facial terms of the solicitation, by protesting the delay in the procurement process.  While CICA sets forth procedures for the Government to sustain a policy of full and open competition, the statute does not mandate that a procurement take place in a certain amount of time or expressly provide that any delay, let alone reasonable, justified delay, is prohibited.  While Plaintiff suggests that it may have to drop out of the competition because it

can no longer provide Type IV aircraft, it has not yet withdrawn and there is no evidence that the other [***] offerors cannot meet the Type IV requirement or are planning to withdraw. Indeed, Plaintiff requests alternative relief that suggests that it could remain in the competition -- that the Agency "allow all offerors, including Draken, a reasonable opportunity to offer new aircraft in the event that aircraft that were originally proposed are no longer available due to the delays in the procurement process." Am. Compl. at 26. Plaintiff has not established that the restrictive solicitation terms and delay caused a reduction in competition that rises to the level of a violation of CICA.

Plaintiff further argues that the Agency violated § 3306(a)(2)(B) of CICA which provides that agencies may "include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law." 41 U.S.C. § 3306(a)(2)(B) (2012). Plaintiff identifies the Agency's "restrictive provision" here as the solicitation's requirements for both Type III and Type IV aircraft and for operational readiness coupled with the delay in conduct of the procurement. However, Plaintiff cannot establish restrictive solicitation provisions here because its challenge to these solicitation terms is untimely. Plaintiff admits that these solicitation provisions were not restrictive at the time it submitted its offer. In plaintiff's view, what made the provisions restrictive under CICA was the length of time the procurement took. But, as Plaintiff admits, this delay did not result from any fault of the Agency -- either arbitrary and capricious conduct or a separate statutory or regulatory violation. The original solicitation had an anticipated award date of March 1, 2014. AR at 586. In Amendment 6, due to the Air USA protest and the change in the proposal submission date, the Agency moved the anticipated award date to April 1, 2014. The Agency did not make an award on April 1, 2014, but continues to engage in discussions with offerors and now anticipates awarding the contract in February 2015. Decl. of Phillip Smith ¶ 9. These delays have been caused by legitimate, unremarkable procurement occurrences -- pre-award agency-level and GAO protests by Air USA and Draken, and the Agency's need to evaluate offerors' responses to 107 ENs and conduct discussions. See id. at ¶¶ 7-9.

Plaintiff purports to combine two agency actions, neither of which was independently illegal, to construct a violation of procurement law. But Plaintiff's invocation of procurement delay does not either convert what were legal solicitation terms into illegal terms, or grant Plaintiff a reprieve for its untimely challenge to solicitation terms. If this Court permitted Plaintiff to pursue an untimely challenge to solicitation terms and ordered the Agency to revise the belatedly challenged solicitation terms merely because there was subsequent legitimate procurement delay, the Court would do violence to Blue & Gold.

In addition to failing to demonstrate that this procurement delay created the type of "restrictive solicitation provisions" prohibited by CICA, Plaintiff has failed to appreciate that the Agency amply justified these challenged solicitation terms. The no-fault delay that ensued did not vitiate that Justification. The Assistant Secretary's Determination and Findings articulated rational reasons for including the Type IV supersonic aircraft along with the Type III subsonic aircraft in this procurement:

- The efficiencies gained by having a single provider provide all resources at all sites as compared to having two contractors at each location using additional space, tooling, and personnel.

- The ability to fulfill Type III missions with Type IV aircraft billed at the lower Type III rate, which allowed the Government "to minimize the required quantity of high subsonic aircraft without compromising the ability to cover surge requirements."

- The avoidance of a scenario where two contractors would use overlapping resources, which would cause logistical difficulties, reduce the funds available for training and decrease the quality of training provided.

- The recognition that the task orders under the contract are so integrally related that only a single source could reasonably perform the effort.

- The avoidance of duplication of costs to provide and maintain multiple fleets of aircraft.

AR 4470-71.

It is well settled that an agency has discretion in defining its needs. See Che Consulting, Inc. v. United States, 74 Fed. Cl. 742, 747 (2006) ("An agency's determination of the 'best method of accommodating' its needs . . . falls within the agency's discretion." (quoting United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 26 (2006)).  This Court would be hard pressed to force the Agency to redefine its needs here because such needs have allegedly become unjustified due to delay that did not result from any procurement error or irrational agency decision.

This is not to say that an agency's procurement delay is either a matter of unfettered agency discretion or immune from judicial review.  The Government submits that procurement delay is purely a matter of procedure that has no effect on the validity of the procurement and does not alone provide a basis to protest. Def. Cross-Mot. for Judgment on the AR 18 (citing Am. Fuel Cell and Coated Fabrics Co., B-234395, Feb. 21, 1989, 89-1 CPD ¶ 183 (holding that a contractor's protest of an agency's delay in making an award had no merit because "a delay in meeting procurement milestones is a procedural deficiency which does not alone provide a basis of protest, because it has no effect on the validity of the procurement").  This Court does not agree.  Rather, an agency's illegal, irrational, or arbitrary delay could provide both a basis for protest and relief.  An agency has an obligation of good faith and fair dealing to bidders participating in Federal procurements, and that duty would prohibit an agency from arbitrarily unduly delaying a procurement by stringing offerors along, requiring them to be at the ready at substantial expense for an unnecessarily extended period. See generally Heyer Prod. Co. v. United States, 135 Ct. Cl. 63, 71 (1956). However, this is not the argument Plaintiff is pressing in this case.  Plaintiff emphasizes that it is not claiming that the procurement delay here resulted from any arbitrary, capricious, or irrational conduct by the Agency. Dec. 8, 2014 Oral Arg. Tr.

13

13:13-21. ("[W]e are not ascribing fault to the agency for the delays. [. . .] And it's not necessary, in our view, to say that the delays were the agency's fault.").

## Draken's Contention That It Was Treated Differently Than Other Offerors is Unripe

Draken argues that the Agency treated it unfairly because the Agency repeatedly stressed the importance of providing airworthiness data with the initial proposals, yet "appears to have waived the requirement *eight months* after offerors were required to comply" for [***] and [***]. Pl. Mot. for Judgment on the AR 32-35 (emphasis in original). Plaintiff speculates that the Agency may accept this data from other offerors, will rely on this data, and will not afford Draken a similar opportunity to provide such data. Id. at 34-35.

ATAC submits that Draken's arguments that it was treated unfairly and prejudicially are not ripe because the award has not yet been made. Intervenor's Mot. for Judgment on the AR at 34-35. The Court agrees with ATAC. This procurement is still ongoing, and the current state of evaluations and discussions is unknown. Ripeness is a doctrine of justiciability that prevents the courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies . . . ." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967). A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur. Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985). In assessing ripeness, there are two basic factors: "'(1) the fitness of the issues for judicial decision[;] and (2) the hardship to the parties of withholding court consideration.'" Sys. Application & Techs. v. United States, 691 F.3d 1374, 1383-1384 (Fed. Cir. 2012) (quoting Abbott Labs., 387 U.S. at 149); Tex. Bio- & Agro-Def. Consortium v. United States, 87 Fed. Cl. 798, 804 (Fed. Cl. 2009). In order to be a final decision, and therefore ripe for judicial review, (1) there must be an agency action that marks "'the consummation of the agency's decisionmaking process,' i.e., it must not be merely tentative or interlocutory, and (2) 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" NSK, Ltd. v. United States, 510 F.3d 1375, 1385 (Fed. Cir. 2007) (quoting Bennett v. Spear, 520 U.S. 154, 177 (1997)).

Here, whether Draken will be treated unfairly and prejudicially compared to [***] and [***] is not yet known and cannot be ascertained until the Agency selects an awardee. In Texas Bio- & Agro-Defense Consortium, this Court recognized that a proposed site selection was not ripe for judicial review because negotiations over the transfer of the property to the agency had not been concluded and because any transfer of the property was contingent upon Congressional funding. 87 Fed. Cl. at 804-06. This Court reasoned that given the uncertainty over what form the potential transfer of land and in-kind contributions from the Intervenor to the agency might take and the multiple potential contingencies, the site selection was not fit for judicial review. Id. at 806. Similarly, in the instant case, the outcome of what Draken claims is an unfair evaluation process has not yet occurred, as the Agency is still in the pre-award evaluation stage of this procurement. Decl. of Philip Smith ¶¶ 4-5. The "consummation of the agency's decisionmaking process" will not occur until award. See NSK, Ltd., 510 F.3d at 1385.

Deciding not to review this alleged unequal treatment does not impose any hardship on Draken. "[W]ithholding court consideration of an action causes hardship to the plaintiff where

14

the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc., 527 F.3d 1278, 1295 (Fed. Cir. 2008) (quoting Gardner v. Toilet Goods Ass'n, 387 U.S. 167,171 (1967)); Texas Bio- & Agro-Defense Consortium, 87 Fed. Cl. at 806.  Withholding consideration of this issue will not harm Draken, as the conduct that it complains of may not ultimately persist or prejudice Draken.

### This Court Will Not Review the Agency's Denial of Draken's Agency-Level Protest

Draken argues the Agency's protest decision was irrational and that the Agency "failed to provide a coherent and reasonable explanation that justified its decision to deny Draken's protest." Pl. Mot. for Judgment on the AR 30-33.  In the bid protest realm, the Court of Federal Claims is not an appellate tribunal empowered to directly review protest decisions of the agency or the GAO.  Cf. Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989); MG Altus Apache Co. v. United States, 111 Fed. Cl. 425, 443 (Fed. Cl. 2013) ("While this Court lacks jurisdiction to review a GAO decision outright, it may assess whether the GAO decision was rational in order to determine whether the procurement action being challenged — the agency's corrective action predicated on that GAO decision — was reasonable.") (citing Honeywell, Inc., 870 F.2d at 647-648).

Under § 1491(b)(1), the Court has jurisdiction in bid protest cases "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. 1491(b)(1) (2012).  An agency protest is not a procurement.  Thus, while Draken may disagree with the agency's denial of its protest, the Court does not have jurisdiction to review or remand the agency's protest decision, but instead reviews the agency's underlying procurement decision or procurement-related actions.  In any event, Plaintiff's challenge to the Agency's protest decision here simply rehashes the grounds of protest it pursued in this forum -- which this Court rejected without evaluating the agency protest decision.

### Conclusion

The Court **DENIES** Plaintiff's motion for judgment on the Administrative Record and Plaintiff's motion for injunctive relief.

The Court **GRANTS** Defendant's motion for judgment on the Administrative Record and Intervenor's motion for judgment on the Administrative Record.  The Court directs the Clerk to enter judgment accordingly.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**